UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

ROBERT BLACKSTOCK            CIVIL ACTION NO. 08-1557

VERSUS                    U.S. DISTRICT JUDGE TRIMBLE

CCA, et al

                          U.S. MAGISTRATE JUDGE KIRK

**REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**

Before the court is a motion by plaintiff for a preliminary injunction pursuant to FRCP 65 and a motion for medical attention which I construe as a motion for preliminary injunction [**Doc. # 12 and 16**]. Plaintiff asks the court to order the prison doctor to provide him with his medications.

In order for plaintiff to obtain a preliminary injunction, he must show: (1) a substantial likelihood that his cause will succeed on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm the injunction may do to the opposing party, and (4) that the court granting the injunction will not disserve the public interest. <u>Piedmont Heights Civic Club, Inc. v. Moreland</u>, 637 F.2d 430 (5th Cir. 1981).

Plaintiff, now an inmate at Winn Correctional Center, alleges that in April 2002 he had a tumor removed from his spinal cord near his brain stem. Thereafter, he was diagnosed with neurological damage, reflex sympathetic dystrophy, abnormal reflex, involuntary

movement and neuropathic pain and anxiety.

When he arrived at Winn in December 2007 from another prison, his prescribed medications were Neurontin[1], diazepam[2] and baclofen[3] according to plaintiff. Defendants suggest that his medications were Neurontin, Naprosyn[4], and Benadryl[5]. The medical records reflect that various medications were tried at Winn by the prison doctor, Dr. Pacheco. In March 2008 plaintiff was admitted to the LSU (charity) hospital with complaints of pain. When he was released, his prescribed medications were Neurontin, Senna[6] and diazepam. He did not receive the Neurontin until April 7, 2008 and diazepam until April 24, 2008. However, Dr. Pacheco

---

[1] Neurontin (gabapentin) is prescribed to treat seizures and also for certain neurologic pain. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

[2] Diazepam (Valium) is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

[3] Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement and also has other uses. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

[4] Naprosyn (naproxen) is a nonsteroidal anti-inflamatory used to treat pain, including muscle aches. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

[5] Benadryl (diphenhydramine), in addition to being commonly used to treat motion sickness and allergy type symptoms, is also used to treat insomnia and certain disorders of the nervous system. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

[6] Senna is a laxative. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

discontinued the Neurontin and diazepam on June 30, 2008. Pacheco testified that he discontinued the drugs because he looked in the Physicians Desk Reference (PDR) and concluded that Neurontin was not indicated for plaintiff's condition, that he had concerns whether plaintiff might be allergic to Neurontin[7] and that it was suggested by his boss, Dr. Andre (ph), that he not use Neurontin because it was not on the corrections department's formulary.

When plaintiff saw his neurologist, Dr. McWilliams at LSU on August 1, 2008, he was still not receiving his medications and his condition had already worsened. His only prescription at the prison was Motrin[8]. Dr. McWilliams prescribed Neurontin again and also Valium. Dr. McWilliams' M.D. resident, Dr. Kelley, wrote a note to the prison on the prescription script saying "Attention prison authorities-pt [patient] needs these meds".

Still, thereafter plaintiff did not receive those medications and only received Motrin from the prison.

Then, plaintiff saw Dr. McWilliams, the neurologist, again on October 24, 2008. The doctor noted again that the medications had been discontinued in June. She also noted that plaintiff said his

---

[7] One has to scour the record for any mention of allergic reaction. Nevertheless, there is a single reference in February 2006. After that time, however, and before his arrival at Winn, Blackstock was regularly prescribed Neurontin and was prescribed it for a short time after his arrival at Winn, all without any noted allergic reaction.

[8] Motrin (ibuprofen) is a nonsteroidal anti-inflammatory. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

physical therapy had been cancelled and he was not getting to use his splints. On October 30th Dr. McWilliams also took the time to write a letter to the prison warden, Wilkerson, explaining Blackstock's medical condition and advising the warden that the prison doctor, Pacheco, had cancelled his prescriptions. She explained that Blackstock had responded positively to the Neurontin and pointed out that a generic version is available. She pointed out that Pacheco's notation in the medical records that plaintiff was "faking" his symptoms was simply not true based on objectively verifiable physical neurological changes. Dr. McWilliams pointed out that plaintiff's condition was not repairable and was irreversible.

She explained that Blackstock was "already developing irreversible complications of his paralysis". She concluded:

> "I find it incomprehensible that the prison physician is denying him Neurontin for pain management as it is not a drug of abuse and is not very expensive in the generic form."

> *** I am writing to you in hopes that you can correct the situation before it becomes a legal issue as I believe that the case record will speak for itself and he appears to have been willfully denied minimal medical care. It makes no sense to send him repeatedly to a specialty clinic for appropriate advice and then have a physician ignorant of the diagnosis and treatment of his problem decide that he should not be treated as indicated. We want to cooperate with you on getting the best care for Mr. Blackstock, but this is not possible when the prison doctor is cancelling all of our prescriptions for him as soon as he returns."

Dr. McWilliams, obviously frustrated with the actions of

the prison, sent a copy of the letter to Louisiana Governor Bobby Jindal, among others. However, and unfortunately, the Governor apparently only forwarded the letter to Dr. Singh, the DOC's medical director. Instead of accepting the letter for what it was--a detailed recitation of the patient's medical condition and his lack of effective treatment at the hands of the prison--Singh considered it to be "accusations" and, instead of attacking the problem, decided he would attack the doctor, Dr. McWilliams. On March 11, 2009 Singh said in an email to the warden that he would contact the Vice Chancellor of LSU-S, Dr. Clay, about the doctor and suggested that she was going "overboard with this"[9]. This, despite the fact that Blackstock was not receiving effective treatment, and had already suffered irreversible complications of his paralysis probably due to the prison's lack of appropriate care.

Despite the doctor's letter to the warden, Blackstock still did not receive his medications and continued to be prescribed only Motrin, with Percogesic being added on January 2, 2009.

On February 12, 2009 (3 ½ months later), Nurse Thomas and Dr. Pacheco at Winn telephoned Dr. McWilliams to discuss his medications and treatment. Pacheco then memorialized the

---

[9] Singh should have noticed that Dr. McWilliams had already sent a copy of her letter to the administration at LSU-S by copying Dr. Kelley, Chief of Neurology, with her letter.

5

conversation in his notes saying that Dr. McWilliams had "recommended some alternatives to Neurontin such as Elavil, Baclofen or Tegretol . . . "

Dr. McWilliams confirmed the conversation in her letter of February 18, 2009 where she recommends Neurontin, Baclofen, or carbamazepine (Tegretol). However, she pointed out that carbamazepine is toxic to the liver and bone marrow and patients need to be closely monitored because of the potentially life-threatening side effects.

Dr. Pacheco chose carbamazepine (Tegretol), the only one of the three medications with potentially serious side effects.

This motion for injunction was then filed. By March 11th the prison medical notes reflected that Blackstock had shown no response to the Tegretol and it was discontinued. Incredibly, instead of starting Blackstock on one of the other two drugs recommended by Dr. McWilliams (including Neurontin which was known to work for him in the past), Pacheco again ignored the specialist's recommendations and chose another drug entirely, Elavil, which is ordinarily used to treat depression[10] and sometimes chronic pain (as opposed to neuropathic pain).

---

[10] See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

So on the very same day that Dr. Singh was complaining about Dr. McWilliams instead of correcting the problem, Dr. Pacheco was once again ignoring Dr. McWilliams' advice-advice obtained at the instance of his own nurse, nurse Thomas, who had initiated the phone call to Dr. McWilliams for the very purpose of obtaining her advice!

On April 28, 2009, the prison added baclofen to plaintiff's prescribed medications.

A hearing on the motion for injunctive relief was set for August 14th; however, because plaintiff was already scheduled to see Dr. McWilliams again that day, it was rescheduled for August 17th.

On August 14th, 2009, Blackstock was seen again by Dr. McWilliams. Blackstock was taking Elavil, baclofen and Percogesic[11]. Dr. McWilliams found that plaintiff was having increased contractures of his hands. Dr. McWilliams recommended that Blackstock receive the physical therapy that had been prescribed before, that he wear his braces, that he take gabapentin (Neurontin) and diazepam (both of which had been prescribed when Blackstock was released from LSU in March 2008 and is what he was taking before that). The doctor suggested that Elavil (which Dr. Pacheco had prescribed) only

---

[11] Percogesic contains a pain reliever (acetaminophen) and an antihistamine (phenyltoloxamine) and is used for mild to moderate pain. See Medline Plus, a service of the U. S. National Library of Medicine and the National Institutes of Health.

7

be given at bedtime.

Dr. McWilliams mailed a letter dated August 25, 2009 which was submitted after the hearing on August 17th. The letter confirmed Blackstock's continued progression of his contractures in both hands and weakness. She noted that plaintiff is disabled and cannot dress himself and cannot put on his braces (splints) without assistance. He has difficulty walking and will fall over if pushed or bumped.

Dr. McWilliams noted that Blackstock is taking baclofen for his spasticity and Percogesic for pain. The doctor explained that Percogesic is not as effective as Neurontin. The doctor reminded the prison doctor that sample medications had been sent back with him at least twice; yet, Blackstock had never received them. She also said that Lyrica is an excellent pain reliever and samples had been sent back with him but, again, he never received them. She reiterated that Neurontin comes in a generic form and is less expensive and it is the medication she recommends. She reminded the doctor that he had taken it before with relief. She explained how Dr. Pacheco could avoid any possibility of it being abused. She explained that the Percogesic is not working and is not a medication appropriate for his problems. She explained how the prison could ensure that plaintiff has the braces available for Blackstock to wear.

After the hearing and receipt of the letter from Dr. McWilliams, Dr. Pacheco finally complied with the specialist's recommendations and prescribed Neurontin, after more than a year (and only sporadic prescriptions before then). In fact, it was on August 1, 2008--over one year before--that Dr. McWilliams' resident had cautioned the prison that "Attention prison authorities–pt [patient] needs these meds".

Deliberate indifference is not now before the court, except to the extent that plaintiff must show a substantial likelihood of success on the merits in order to obtain injunctive relief.

The only issue before the court now is whether an injunction should issue. I find that it should. There is a substantial likelihood that plaintiff's claim will succeed on the merits.

A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). Also, Chapman v. Johnson, 2009 WL 2391496, *2 (5th Cir. 2009)(fact that defendant was aware that inmate

9

had a serious injury and was instructed to provide pain relieve medication, but did not do so, could demonstrate an Eighth Amendment violation).

Dr. Pacheco's stubborn refusal, for no valid reason, to follow the recommendations of the specialist to whom he had sent the patient rises to the level of deliberate indifference. While the court recognizes that a simple disagreement as to appropriate medical care is ordinarily not sufficient to constitute deliberate indifference[12], here the situation was far more than a simple disagreement. Rather, the prison had specifically referred plaintiff to the neurologist because, it can be assumed, Dr. Pacheco, who is not a neurologist, needed the specialist's expertise in this serious and complicated medical case. Further, Dr. Pacheco had no legitimate reason for not following the specialist's recommendations. He should not have used the PDR to override the specialist's recommendations; if he had concerns he should have picked up the phone and called her. That Neurontin is not on the department of corrections formulary is of no consequence, for it is available in a generic form and is less expensive than what they were giving him, according to Dr. McWilliams. The excuse that plaintiff may be allergic to Neurontin is not borne out by the evidence and, in any event,

---

[12] See <u>Stewart v. Murphy</u>, 174 Fed3d 530, 535 (5th Cir. 1999).

was never even investigated by the prison doctor. Finally, Neurontin is a drug that had helped Blackstock and was a successful treatment for him both before and after his arrival at Winn. Yet Winn tried one thing after another–everything <u>except</u> what the specialist <u>who the prison sent him to</u> recommended[13]. I share Dr. McWilliams' bewilderment as to why Dr. Pacheco was so "reluctant" to use Neurontin. Pacheco's actions constituted a wanton disregard for Blackstock's very serious medical condition.

Next, there is a substantial threat of irreparable injury. Indeed, Dr. McWilliams has already documented Blackstock's preventable deterioration. The threatened injury outweighs any potential harm in issuing the injunction and will not dis-serve the public interest. Therefore, all of the factors weigh heavily in favor of granting injunctive relief to plaintiff.

## Conclusion

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's requests for preliminary injunction [**Doc. #12 and 16**] be GRANTED and that the prison be ordered to provide to him the medications prescribed for him by the specialist that the prison sent him to for evaluation, Dr. McWilliams.

---

[13] Dr. Pacheco testified at the hearing: "And I consulted with him [Dr. Andre, his supervisor at DOC] and he said 'well try this and that'."

11

**OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing. Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this 4th day of September, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE